849 So.2d 72 (2003)
Jack SINGLETON and Louisiana Gin Co., Inc.
v.
AMERICAN SECURITY BANK OF VILLE PLATTE, INC.
No. 02-1109.
Court of Appeal of Louisiana, Third Circuit.
April 30, 2003.
*73 Hon. Jerold Edward Knoll, The Knoll Law Firm, Marksville, LA, E. Joseph Bleich, Gerald Wade Burnett, Ruston, LA, for Plaintiffs/Appellants, Jack Singleton, Louisiana Gin Co., Inc.
Johnny Everett Dollar, Dollar, Laird, LLP, Monroe, LA, for Plaintiff/Appellant, Jack Singleton.
Keith Wayne Manuel, Marksville, LA, for Plaintiff/Appellant, Louisiana Gin Co., Inc.
Darryl J. Hebert, Eunice, LA, John Carl Davidson, Alexandria, LA, for Defendant/Appellee, American Security Bank of VillePlatte, Inc.
Vincent Ross Cicardo, Alexandria, LA, In Proper Person/Intervenor, Vincent Ross Cicardo.
Thomas Overton Wells, Alexandria, LA, for Intervenors, Melvin Jordan, Thomas R. Douglas, Jr.
Court composed of JOHN D. SAUNDERS, OSWALD A. DECUIR, and GLENN B. GREMILLION, Judges.
GREMILLION, Judge.
Both the plaintiffs, Jack Singleton and the Louisiana Gin Company, Inc., and the defendant, American Security Bank of Ville Platte, appeal the judgment of the trial court regarding this banking matter. The trial court held that American Security wrongfully offset the Gin's checking account in order to satisfy its and Singleton's personal obligations. It further held that American Security wrongfully took Singleton's $10,000 certificate of deposit, which it had on deposit, in order to satisfy the Gin's obligations. Also appealing, as an intervenor, is V. Ross Cicardo, who represented several farmers who intervened in this matter at the trial court level. All three parties appeal from this judgment. For the following reasons, we affirm in part, reverse in part, and remand.

FACTS
This lawsuit stems from actions taken by American Security in offsetting the checking account of the Gin following a deposit by Singleton of money belonging to individual cotton farmers. The December 20, 1994 deposit totaled $316,804.58. That same day, American Security offset a total of $186,820.58, in repayment of obligations owed by both the Gin and Singleton, personally. *74 This offset started a chain of events which eventually led to the Gin's downfall.
In 1993, a group of shareholders formed the Louisiana Gin Company, Inc. and purchased an existing cotton gin located on the Cane River in Natchitoches Parish, Louisiana. The shareholders borrowed $450,000 from American Security, in addition to the $200,000 they contributed, in order to purchase the gin. This loan was secured by a collateral mortgage note and mortgage in the amount of $500,000. Singleton signed this note both individually and in his capacity as vice-president of the Gin.
The Gin borrowed an additional $133,855 from American Security on August 16, 1994, in order to purchase cotton module builders. This loan was secured by a commercial security agreement covering certain equipment owned by the Gin. On April 18, 1994, Singleton personally borrowed $60,199 from American Security, which was secured by collateral contained within a UCC-1F Financing Statement, including vehicles, equipment, and approximately 900 acres of cotton, as well as a $10,000 certificate of deposit on deposit with American Security.
After incurring overdraft charges on its checking account beginning in February 1994, the Gin entered into an overdraft protection agreement with American Security. This security line carried a maximum credit line of $50,000 and was secured by a UCC Collateral Security Agreement and the $500,000 collateral note and mortgage. The first advances on this overdraft line occurred in June 1994. By September 1994, Singleton had become the president and majority shareholder of the Gin.
On October 5, 1994, the Gin borrowed $50,030 from American Security. The loan, numbered XXXXXXXXX, was to be paid in one payment due on October 14, 1994, and was secured by the $500,000 collateral mortgage note and mortgage. This loan was paid off on October 20, 1994. American Security alleged the existence of a second loan in October 1994, for $50,030, loan number XXXXXXXXX. The only evidence of this loan produced by the bank was a photocopy of the original October 5, 1994 loan, which contains handwritten changes to the original by Donald Meeker, a loan officer with American Security and the manager of its Bunkie branch.
On December 20, 1994, Singleton deposited four checks at American Security's Alexandria branch, which he had received from Maxwell Cotton Co., Inc. Maxwell Cotton had purchased a block of cotton grown by several different farmers and pooled together by the Gin. The deposits totaled $316,804.58. There is a dispute as to what was to happen to these funds. As soon as these deposits were made, the Bunkie branch of American Security offset a total of $186,820.58 from the Gin's checking account for the following reasons: (1) to pay off Singleton's personal loan in the amount of $63,887.73; (2) to pay off the Gin's loan, numbered XXXXXXXXX, in the amount of $50,934.65; (3) to replenish the Gin's overdraft checking account in the amount of $21,291.70; (4) to repay the Gin's automatic security line in the amount of $50,411.79; (5) to pay the automatic security line in the amount of $189.71; and, (6) to pay an overdraft fee in the amount of $105.00.
Although Meeker and Singleton both testified that they were in almost daily contact with each other, Meeker testified that Singleton gave him permission to withdraw funds from the checking account in order to apply them towards certain obligations belonging to him, personally, and to the Gin. Singleton, however, testified that he contacted Meeker and told *75 him not to offset the funds since they belonged to the individual farmers whose cotton was sold to Maxwell Cotton. He stated that Meeker agreed not to do so. Meeker denied he was told that the funds belonged to the farmers.
Once the Gin's checking account was offset, its ending balance on December 20, 1994, was $112,148.20. On December 21, 1994, Singleton wrote a check to "Billy Dowden Farms, H.A. Boughton, Helena Chemical Company" in the amount of $188,810.60. This check was presented for payment to American Security on December 27, 1994. At this point, the testimony differs again as to what happened. Singleton testified that Meeker called him and told him that there was not enough money in the Gin's account to cover the check because of the prior offsets. Singleton told him that the account should not have been offset because the money deposited belonged to the farmers and not to the Gin. He stated that Meeker then told him not to worry about it, that he would take care of the problem. Singleton then called Brenda Saucier at the Ville Platte branch and was told that she was sending the check back due to an improper endorsement. He called Meeker again, who told him that the check was being returned for an improper endorsement and that he would have to issue a new check. At this point, Singleton thought that the problem had been taken care of and that the offsets would be reversed. Meeker, however, denied having any conversations about the $188,810.60 check, and denied telling Saucier to cancel an NSF action on the check in order to send it back due to an improper endorsement.
On December 29, 1994, Singleton wrote two more checks pertaining to funds received from the Maxwell Cotton deal. He wrote a check to Melvin Jordan in the amount of $140,633.58, which was presented for payment on January 3, 1995. It was dishonored for insufficient funds on January 4, 1995. Helen Patterson, of the Bank of LeCompte, handled Jordan's accounts. She contacted Meeker about the check, and was told that there had been some problems, but that if she sent the check back through it would be paid. The check was presented for payment on January 6, 1995. It was again dishonored for insufficient funds.
Singleton wrote a second check to Douglas Farms in the amount of $136,894.49. This check was presented to American Security for payment on January 4, 1995. After the check was returned, Karen Vidrine Pettijean, a bookkeeper at Evangeline Bank, called American Security and spoke to either Brenda Saucier or Peggy Tate in the bookkeeping department about the check. She was told to send the check back through and was assured that it would be honored. When the check was presented for payment a second time on January 11, 1995, it was again dishonored for insufficient funds. Meeker denied that assurances were given to the bankers that the checks would be honored. Instead, he stated that they were told to run the checks through and that they would be honored if there were sufficient funds in the Gin's account at that time.
On January 5, 1995, Singleton wrote another check to "Billy Dowden, H.A. Boughton, Helena Chemical" in the amount of $188,810,60. This check was presented for payment on January 9, 1995, but was returned on January 10, 1995, for insufficient funds.
As a result of these incidents, the Gin experienced an interruption in its cash flow. Due to the seriousness of the problem, Singleton contacted Ag Services of America, Inc., an Iowa company, and discussed the possibility of it acquiring American Security's interest in the Gin. After *76 several months of negotiations, Ag Services was prepared to purchase American Security's notes and collateral position in the Gin. It hired a Louisiana law firm to handle the transaction and thought it had reached an agreement with American Security. However, on May 19, 1995, the date the transaction was to be carried out, Ag Services learned that American Security had sold the mortgage to NMP, Inc. Ag Services later acquired the mortgage from NMP, Inc., and allowed Singleton to continue operating the Gin. However, the Gin never regained its former footing due to its and Singleton's reputation concerning the dishonored checks, and foreclosure proceedings were later brought against them. As a result of this situation, numerous lawsuits have been filed against both the Gin and Singleton in federal and state court. Singleton has also been arrested twice and charged with issuing worthless checks.
The Gin and Singleton filed suit seeking to recover damages arising from the actions of American Security in wrongfully offsetting the Gin's checking account. Following a bench trial, the trial court issued its original and supplemental written reasons for judgment finding that American Security wrongfully offset the Gin's account in the amount of $114,822.38, representing the personal obligation of Singleton and the modified October 25, 1994 loan. The trial court found no evidence that the Gin endorsed or was responsible for Singleton's personal obligation, nor was their any evidence that Singleton personally endorsed the Gin's obligations. It further held that American Security never gave any notice of default to either the Gin or Singleton. Accordingly, it held that Singleton was entitled to the return of the $10,000 from his seized certificate of deposit and further awarded him $5,000 in attorney's fees.
With regard to the remaining $71,998.20 offset from the Gin's checking account, the trial court held that these amounts were correctly offset since they were authorized by the security line agreement existing between the Gin and American Security, and by operation of law. The trial court held that the verbal assurances given by Meeker to Singleton that the offsets would not be made and that the checks deposited for and on behalf of the farmers would be paid were not binding on American Security. In its supplemental reasons, it held that the verbal communications by the employees of the other banks and by the farmers themselves, were insufficient to apprise American Security of the fact that the monies deposited belonged to them as opposed to the Gin.
With regard to liability, the trial court held that American Security was liable for any consequential damages suffered by the Gin. However, in its supplemental reasons, it stated that Singleton was a sophisticated businessman, who should have been aware that the Gin's checking account was deeply overdrawn. It further stated that Singleton could have protected the farmers' money by depositing the funds in an escrow account or in the Gin's account at a different bank. Although the trial court found that the actions of American Security aggravated the Gin's financial situation, it stated that the Gin's cash flow was already in shambles at the time of the actions at issue. Consequentially, it held that American Security was not the cause of the Gin's demise or the cause of its losses. The trial court further held that American Security was not liable to Singleton personally.
A judgment was rendered on April 29, 2002, awarding the Gin $110,199, which was the amount wrongfully offset from its checking account. It awarded Singleton $10,000 for the wrongfully seized certificate of deposit, along with $5,000 in attorney's *77 fees. The judgment cast American Security with all costs. It further recognized the interventions of Thomas Douglas and Melvin Jordan against Singleton and the Gin in the amounts of $79,000 and $46,000, respectively. Singleton, the Gin, and American Security all appeal from this judgment. The intervenors, Douglas and Jordan, also appeal. An intervention was filed in this matter by Cicardo, who represented Douglas and Jordan at the trial court level. Following the rendition of the judgment, his services were terminated by them. He now files an intervention in this matter seeking to have this matter remanded to the trial court for a determination of the legal fees and expenses owed him.

ISSUES
On appeal, the Gin raises three assignments of error. It argues that the trial court erred in finding that American Security was authorized to use the farmers' funds to satisfy its overdraft checking account and security line of credit, in failing to award it consequential damages as a result of American Security's actions, and in finding that it would not have been able to pay its outstanding checks even if American Security had not improperly debited its account.
Singleton raises one assignment of error, arguing that the trial court erred in holding that American Security was not personally liable to him.
American Security also raises only one assignment of error on appeal. It claims that the trial court erred in finding that it improperly debited $114,822.38 from the Gin's account, and that the application of Singleton's $10,000 certificate of deposit was improper.
Cicardo argues that this matter should be remanded to the trial court for a determination of his legal fees and expenses owed to him by Douglas and Jordan.
Douglas and Jordan have not filed briefs in this matter.

LOUISIANA GIN
Overdraft Charges
In its first assignment of error, the Gin argues that the trial court erred in finding that American Security was authorized to use the funds on deposit in its checking account to satisfy its overdraft checking account and its security line of credit. We disagree.
The Gin entered into the security line agreement with American Security in May 1994, after incurring overdraft charges on its checking account beginning in February 1994. The security line agreement had a maximum credit line of $50,000 and was secured by a UCC Collateral Security Agreement and a pledge of the $500,000 collateral note and mortgage. The agreement provided in pertinent part:
....
Pay All: I am required to make a deposit to pay the full balance of the "Security Line" within every 30 day billing cycle; in addition, if my new balance exceeds the maximum credit level for any reason, the excess will also be due and charged to my checking or savings account; if there is a balance on the "Security Line", payments will be taken as often as deposits are made to the account.
....
Security: I am giving you a security interest or mortgage on my Commercial R.E. & Equip. to secure my accumulated outstanding balance of whatever I borrow under this agreement or may owe the Bank at any time. I also agree to having the above collateral secure any other debts the undersigned may have *78 with the Bank whether direct or indirect. In the event this or any other debt is not paid timely, the Bank will have the legal right to have any of my property in the Bank's possession or control taken from me and sold to reduce my debt; this includes the right of "setoff" against any account we the undersigned may have on deposit with the Bank. Any property held or pledged to the Bank may be held as security against payment of any debt I owe the Bank....
Pursuant to Louisiana law, a bank is entitled to treat any funds deposited in an account as belonging to the owner of the account, unless notified otherwise by the depositor. La.R.S. 6:317; Guillot v. Union Bank, 617 So.2d 1343 (La.App. 3 Cir. 1993). La.R.S. 6:316 further provides that "compensation takes place by operation of law between funds held on deposit with any bank ... and any loan, extension of credit, or other obligation incurred by the depositor in favor of the bank," except against those funds held in a tax deferred account. La.R.S. 6:316(A). This right is in addition to any contractual rights of compensation or setoff contained within agreements existing between the bank and its customer. La.R.S. 6:316(E). In Guillot, 617 So.2d at 1346, we further held that verbal notification to bank employees that the funds on deposit at the bank belonged to a specific depositor, rather than all of the named depositors on the certificate of deposit, was insufficient "legally to rebut the presumption of ownership or to negate the pledge rights acquired by [the bank] conventionally and by operation of law."
Considering the above stated law, we find that American Security was entitled to treat the funds found in the Gin's checking account as belonging to it. We further find that the verbal communications to Meeker by Singleton, Pettijean, and Patterson, that the funds belonged to the farmers, were insufficient to rebut the presumption that the funds found in the Gin's account did belong to it.
Accordingly, we find that American Security was authorized, pursuant to its contractual rights and by operation of law, to offset the Gin's account in order to replenish its overdraft checking account in the amount of $21,291.70; to repay its automatic security line in the amount of $50,411.79; to pay an automatic security line payment of $189.71; and, to pay an overdraft fee in the amount of $105.00. The judgment of the trial court finding that American Security properly offset the Gin's account in these amounts is affirmed. This assignment of error is dismissed as being without merit.
Since we have found that American Security properly offset the Gin's accounts, the Gin's remaining two assignments of error have been rendered moot. Accordingly, we need not address them.

SINGLETON
In his one assignment of error, Singleton argues that the trial court erred in failing to find that American Security was liable to him personally as a result of its actions in improperly debiting the Gin's account. We find no merit in this argument.
Pursuant to La.R.S. 6:1124, no fiduciary relationship exists between a bank and its customers or third parties unless it is agreed in writing that a relationship of agency or trust exists between the parties. In this instance, no such agreement has been introduced into evidence. Accordingly, we find that American Security owed no fiduciary duty to Singleton personally.
Further, a bank is liable to its customer for damages it causes by the wrongful dishonor of an item. La.R.S. 10:4402(b). *79 A customer is a person having an account with the bank. La.R.S. 10:4-104(a)(5). In this instance, the customer whose checks were dishonored was Louisiana Gin, not Singleton. Thus, American Security is not liable to Singleton. The judgment of the trial court denying Singleton damages is affirmed.

AMERICAN SECURITY
In its assignment of error, American Security argues that the trial court erred in finding that it improperly debited $114,822.38 from the Gin's checking account and improperly applied Singleton's $10,000 certificate of deposit. This amount represented the $63,887.73 applied to pay off Singleton's personal loan and the $50,934.65 applied to pay off the Gin's loan as alleged by American Security.
In holding that American Security improperly offset the $63,887.73 to payoff Singleton's loan, the trial court found that there was no evidence that the Gin endorsed or was responsible for Singleton's personal obligation. The paperwork for the loan reveals that the note was secured by collateral contained in a UCC-1F Financing Statement including a bole buggy, a module builder, Ford and GMC pickups, a Case tractor, approximately 900 acres of cotton, and a $10,000 certificate of deposit on deposit at American Security. The note was signed by Singleton, personally, and not in his capacity as an officer and majority shareholder of the Gin. Accordingly, we find no error in the trial court's finding that the Gin was not responsible for this note. Thus, American Security improperly offset the Gin's account in the amount of $63,887.73, in order to payoff Singleton's personal obligation.
The trial court further held that the Gin's October 25, 1994 loan of $50,030 was unenforceable because American Security was unable to produce the original of the note. The only evidence of this note is a photocopy of the October 5, 1994 promissory note bearing loan number XXXXXXXXX, which contained handwritten changes by Meeker. These changes include changing the loan date from October 5, 1994 to October 25, 1994; changing the loan number from XXXXXXXXX to XXXXXXXXX; and changing the maturity date of the note from October 14, 1994 to December 25, 1994.
We agree with the trial court that this photocopied note was unenforceable. A promissory note is evidence of a debt which allows the holder of the note certain rights, including the right to enforce collection of the underlying debt. However, enforcement is impossible unless the original note is produced. Richey v. Richey, 98-1195 (La.App. 3 Cir. 3/10/99), 733 So.2d 618, writ denied, 99-2122 (La.10/29/99), 749 So.2d 639. Accordingly, the trial court correctly held that this note was unenforceable and that American Security improperly offset the $50,934.65 from the Gin's account.
However, we agree with American Security that the trial court erred in finding that it improperly applied Singleton's $10,000 certificate of deposit to the Gin's obligations. The August 16, 1993 promissory note by the Gin in favor of American Security, in the amount of $133,855, contains Singleton's signature in both his individual capacity and as an officer of the Gin. Thus, he personally assumed responsibility for this note. Pursuant to La.R.S. 6:316(A), if the Gin defaulted on this obligation, then American Security would have the right, by operation of law, to apply the funds from Singleton's certificate of deposit towards that obligation. Mahler v. First Nat'l Bank of Houma, 93-0619 (La.App. 1 Cir. 3/11/94), 634 So.2d 22. Accordingly, the judgment awarding Singleton the return *80 of the $10,000, plus $5,000 in attorney's fees, is reversed.

CICARDO
In the final assignment of error, Cicardo request that we remand this matter to the trial court so that his legal fees and expenses may be determined. We find that Cicardo could have intervened in this matter at the trial court level, thus, he has the right to appeal this matter pursuant to La.Code Civ.P. art.2086. However, we agree that the determination of his legal fees and his expenses is best left to the trial court. Accordingly, we remand this matter to the trial court for a determination of legal fees and expenses owed him by Douglas and Jordan.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed insofar as it awards Singleton $10,000 and $5,000 in attorney's fees. In all other respects, the judgment of the trial court is affirmed. This matter is remanded to the trial court so that the legal expenses of V. Ross Cicardo may be determined. The costs of this matter are assessed fifty percent to the defendant-appellee appellant, American Security Bank of Ville Platte, and fifty percent to the plaintiffs-appellants appellees, Louisiana Gin Company, Inc. and Jack Singleton.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.